If I could just inquire of either Mr. Duckers or Mr. Woods, do you intend to split your time or is there one of you who are? We intend to split our time, Your Honor. And how would you like to do that? I have, Mr. Duckers, I have 8 minutes and Mr. Woods has 7 minutes. And any, no rebuttal? No, Your Honor. Okay. Or are you first? Hold on a second, I'm sorry, you don't get rebuttal. Please proceed. May it please the Court, David Cooper on behalf of Tradeline Enterprises. I'd like to reserve 4 minutes for rebuttal. In this case, the District Court compelled Tradeline to arbitrate its claims against the defendants based on the arbitration provision of an agreement that the defendants did not which this Court has consistently recognized as a very narrow exception to the rule that a party should not be forced to arbitrate claims against someone with whom it has never agreed to arbitrate. Isn't the issue in this case entirely one of State law? In other words, if this contract was arbitrable, if this dispute was arbitrable under the law of Arizona, then the District Court was correct. If it was not arbitrable under the law of Arizona, the District Court was incorrect. Is there any Federal issue involved here at all? There is to one extent, and that is that State law in this context, according to the Supreme Court in the Arthur Anderson case, is limited to traditional exceptions. So to the extent Right, but the equitable estoppel is a traditional exception. Are you saying the Supreme Court was saying that the States don't have the freedom to craft their own equitable estoppel principles? They could if it was traditional and if it were applied equally not just to arbitration clauses but to every kind of contract. Where do you find that in the Federal jurisprudence? So the Federal jurisprudence, well, Arthur Anderson made clear that when he was talking about the exceptions, he was talking about them in the sense of being part of traditional State law. Well, and this is part of traditional — I'm from Arizona. Not all of our law is traditional. But it's part of traditional Arizona law. Are you saying it must be traditional to the 50 States? No. I'm not saying it has to be traditional to the 50 States. And I don't think we have to get into this kind of complicated issue of what is traditional and what is not, because Arizona has not suggested that it intends to create some kind of unique and special equitable estoppel rule. Well, but Arizona does say non-signatories can compel arbitration, can compel a signatory to an agreement with an arbitration clause, to arbitration under certain circumstances, correct? Correct. So why doesn't this fit within those circumstances? It doesn't fit under those circumstances because the equitable estoppel exception is only for cases where a party is trying to impose the obligations of a contract on the non-signatory. But the Arizona case, the Sun Valley one, says when the dispute is inextricably intertwined or intertwined with the subject matter of the contract that has the arbitration clause. So it's not simply to impose the obligations of a contract, because otherwise it would only apply to third-party beneficiaries. That's not what the Arizona cases say. It's not a third-party beneficiary doctrine. It's an equitable estoppel doctrine. So why isn't this claim intertwined with the subject matter of the contract? So two points. First, if that were the case, it would not just apply in the third-party beneficiary context, because there are a whole bunch of other sort of nondescript doctrines where you might impose, for example, on a parent company, not because if it's a alter ego, but just because there's State law concerning when you can impose contract obligations on non-parties that are taking the benefits of the contract, even if they aren't technically third-party beneficiaries. But that just means that that State might have a broader concept of third-party beneficiary. That's not the argument here. These folks aren't saying we're entitled to the benefits of the contract. They're saying that our dispute with you is intertwined with the interpretation of the contract. You've agreed to arbitrate disputes about the contract, so let's go to arbitration. Correct. But when parties talk at one — I'm sorry. When courts discuss the question of what is inextricably intertwined, and that's something that this Court — I mean, this Court uses the exact same language, is it inextricably intertwined, in cases like Cramer, Murphy, again and again. And this Court has explained that inextricably intertwined in this context means that you are trying to impose the duties of the contract on the non-signatory. And there's no — Is that true under Arizona law? So Arizona law hasn't specifically addressed this, you know, question of what does inextricably intertwined mean, but I think it's important to recognize that when — that this language, which comes from the Sun Valley Ranch case, is quoting an Eighth Circuit case called Seedy Partners. And the Eighth Circuit, in cases postdating that, interpreting Seedy Partners, have recognized this exact limitation on what inextricably intertwined means. And you can look at the In Re Wholesale case from the Eighth Circuit, which concerned an antitrust claim, and the Court explained when you're dealing with an antitrust claim, you're trying to impose the obligations of antitrust law, not the obligations of the contract. Can you point me to where you specifically — where you think this requirement is suggested in Sun Valley Ranch? If I understand, you agree that Arizona law controls here, or that they agreed that Arizona law would control? Correct. Okay. And so we have a case that looks to be pretty much on point, Sun Valley Ranch. You point to other authorities, non-Arizona authorities, for your position. It seems like we have to deal with Sun Valley Ranch. I'm trying to figure out where you think that requirement of breaching the contract is required or suggested under Sun Valley Ranch. Because where I read it, it says that a claim relies on a contract when the claim makes reference to or presumes the existence of the contract, or the claim arises out of and relates directly to the contract. That doesn't seem to require that the claim must be seeking to hold the non-signatories liable for breaching the agreement. It seems like it's simply requiring that the claim be closely linked and dependent to the existence of the agreement. Tell me why I'm reading that wrong. So that sentence comes at the end of a paragraph quoting C.D. Partners. And C.D. Partners is explaining that there are two scenarios where equitable estoppel might apply. And the first sentence is, one is when the relationship is sufficiently close that only by permitting the non-signatory to invoke arbitration can evisceration of the agreement be avoided. That's the first one. And here we would say that there's no evisceration of the arbitration agreement. It would have a perfectly useful and ordinary purpose as applied to subpoena the signatory without applying it to the non-signatory defendants. So that's the first part of that paragraph. The second is, another is when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the non-signatory. Isn't that this case? What they're saying is, because of these agreements, we have and the various actions of the parties putting these all together, we have an antitrust violation. That is what they're saying. And that is, and we agree that that would, if that were the case, then that would fall within that part of the test. But that is not the case here. Because although it is alleged that there was a breach, that is not the basis for the claim. And just to be clear about why that is, it's because even if there were no breach, so for example, we allege that there was a breach of this 45-day notice period, and that there was a conspiracy involving that. However, even if there was no breach at all, let's say that that you might still have an antitrust claim. But that's not what you allege here. See, the difficulty is, let's assume there were no antitrust claim at all here, and your claim were instead for intentional interference with contractual relations. Would that be arbitrable? Wouldn't you have to interpret the contract as the basis of that claim before one even got to whether there was interference? Most likely, yes. And that's essentially the claim here, which is that you manipulated the contract provisions in order to exclude us from this market. No. For example, first of all, much of the claims do not deal with the specific provisions of the contract at all. It deals with disparaging Trade Line to its potential customers, and therefore subverting its ability to sell the product. But the disparagement is about whether or not they have the right to sell the product. No. Part — there was some disparagement related to that. There was also disparagement completely unrelated to that, which is this is a company that's selling bad — essentially bad product, mixed product, and therefore you shouldn't deal with them. So the disparage Doesn't that arise out of the contract dispute where somebody said, one reason we're putting you on the watch list is because your products have mixed — mixed sources in them, if you will? The facts are certainly relevant to the contract dispute. We wouldn't — we wouldn't disagree that the facts can be relevant to both the antitrust claim and facts could be relevant to a breach-of-contract claim or a tortious interference claim. But the point is that our antitrust claim, if this goes to a jury or if a judge is deciding this in summary judgment and looking at the elements of the antitrust law, none of them has to do with whether or not there was a breach. A jury would not be asked in this case whether there was a breach. Well, let me ask the question differently. Let's assume that the contract — that they improperly breached the contract with you, the defendants, that you hadn't done anything wrong. I'm sorry, that the defendants improperly breached. Yeah, improperly. In other words, that you — that the contract was terminated inappropriately, that this was all the result of a conspiracy, and that — at the end, what you're seeking to do, is it not, is to enforce the contract? No, absolutely not. We're not trying to get 45 days back. We're not trying to get compensation because, for example, they breached — I should say, Supema breached the 45-day notice provision. Even if that breach occurred, if there was no conspiracy, if there was no antitrust injury, if there was no harm to competition, then we admit we would be entitled to nothing. So our claim is not based on whether or not a breach existed. Yes, we allege a breach because it is indicative of a conspiracy. So let me ask the question the other way. Maybe this is more helpful. What if it's true, everything that — all the reasons that the contract was terminated, what if those all turned out to be true? Do you have an antitrust claim? I'm sorry. That all the reasons that the — Yeah. The contract was properly terminated. Oh, it was properly terminated. It was properly terminated. Absolutely. What's your antitrust claim? Our antitrust claim is a concerted refusal to deal or group boycott. So, for example — Oh, no. But, see, I'm saying they terminated you under my scenario. Correct. Because you had terrible product and didn't comply with the contract. And that's — those are the facts. I know you don't think they are, but those are the facts. Do you have an antitrust claim under that circumstance? I hesitate to answer only because when you say because of — if Supema had acted unilaterally and said, look, you're not complying with the contract, therefore you're gone, then that would not be an antitrust claim. But something that can be done unilaterally cannot necessarily be done through concerted action under the antitrust clause. No, I mean, let's assume Supema gets the information from the trade association, if you will. The names — all the names here have Supema in them, so they're a Let's assume Supema gets the information from another party about how you're not complying with the contract because you're putting out shoddy goods. And Supema will put you on the list and eventually terminate you. And those facts all turn out to be true. Do we have an antitrust claim? There would still be an antitrust claim. I think they would have a very strong — let me — if that were — if they were right about that — If they excluded you, in effect, from the market because you had breached the contract, that would — you would not have an antitrust claim, would you? If they exclude us from the market because we — Because you had a contract with — If that was the only reason, then yes. If that was the only — but let me be clear about this. That sort of assuming — I think that the reason why the cases don't go into that kind of detail in who's right and who's wrong about particular facts is because there's a clear demarcation in the case law where contract-based claims, like those in Sun Valley Ranch, are treated as, oh, you're trying to impose the obligations of the contract, get the benefit of the contract in an unfair way if you want to avoid the arbitration provision. Whereas here, we are not saying that they are liable for a breach. The breach was by Supema. So to the extent anyone's liable for that, that would be Supema. They are not — Question one more time, differently. What if you didn't have a contract at all with Supema? Exactly. What if you had no contract whatsoever with Supema? Yes. Would you have an antitrust claim? Absolutely. Why? Aren't they — don't they — don't they have the absolute right to determine who to license to? No. They do not have an absolute — so this is what the antitrust claim for group boycott is about, which is if you get together, if competitors get together to exclude someone from the market, that could be an antitrust violation, regardless of whether or not they were in the market in the first place or had a contract or whether there was a breach of that contract. And this — I think this is the fundamental point. Is that true in the licensing context? I understand it in the general context, but I have a — I have a trademark. I want to license it to people. Don't I just get to decide who to license it to? You do, but you — you as competitors getting together through concerted action do not, or at least there is a potential antitrust claim there. Obviously, you would still have to prove the elements of the antitrust claim, but there's certainly a potential antitrust violation there. And so, for example, here, it's alleged in the complaint that they could have terminated in six months for no reason at all, or they could have not renewed the contract in the first place. And we allege that the reason why they didn't do it through those mechanisms, which pretty clearly would not have been a breach, was essentially to provide cover so that they wouldn't look bad to other manufacturers and to the industry as a whole. So we don't dispute that they actually could have terminated in a way that wouldn't have been a breach. And our argument is, even then, it still would have been an antitrust violation because they were doing it in a conspiracy with the purpose of restraining trade and preventing our business model from disrupting their industry. Okay. Thank you. You've used all but a few seconds of your time. May it please the Court, Ed Duckers from Stoll Reeves on behalf of Jess Smith and myself. The question presented, and it's been alluded to in your questioning on this appeal, is whether the District Court erred in its application of Arizona law to the facts as pled in the complaint in this case when it ruled that the doctrine of equitable estoppel under Arizona law required this matter to be compelled to arbitration. The two things that Tradeline has studiously avoided talking about in this appeal are Arizona law and the facts that they pled in their complaint. And as you just heard in the argument presented to you, they are asking you to apply the law of other jurisdictions and to ignore what was actually pled in the complaint with respect to this antitrust claim. Arizona law is clear. It's set forth in Sun Valley. It was confirmed a few years later in the unpublished Kerry case. But Sun Valley, the plaintiffs were not asserting an antitrust claim, right? That's right. And so why doesn't that distinguish Sun Valley Ranch from the facts here? It seems like the antitrust claims arise from statute and here the contract, and not from contract. So what's your response to that? My response to that is I don't believe that the fact that this is an antitrust claim makes any difference at all. It's a claim that arises out of an agreement. To the extent it's an antitrust claim, the antitrust violation was to deny Tradeline its procedural and substantive rights under the contract and for subpoena to breach that contract. There is, you know, the question. But do you agree, I guess what Mr. Cooper was trying to say, that these antitrust claims would be cognizable even without a license agreement? Absolutely not. Let's assume you had no contract with his client. There would be no antitrust claim. Well, but people got together and said, we don't like this guy. Let's make sure he never gets access to this stuff. Would there be an antitrust claim? I don't believe so, Your Honor. It's hard for me to imagine, you know, exactly those facts. I have to deal with They're not the facts of this case, but I'm asking that question. I don't know. I haven't thought about that, Your Honor. I think it would be permissible for people in an industry to say, we don't want to do business with this particular person. But in this case, I take it your argument is that the antitrust claim is really intertwined with the contract claim because that's what gave rise to whatever the antitrust allegations are. Right. This is paragraph 172 of the complaint, which describes the antitrust claim. It says that the defendants in subpoena agreed that they would act in concert and did act in concert to deprive Tradeline of important procedural protections. It should have enjoyed, with respect to its license agreement with the association, to disparage Tradeline's products, which flows out of those procedural protections. Well, does it? I mean, presumably, disparagement of the product might be different than the contractual. It could be, but not as pled in this complaint. The procedural protections, or at least one of the procedural protections that is complained of, is the manner in which subpoena responded to customer complaints about adulteration and tested Tradeline's products. So the disparage, and Tradeline tested it and then passed those results on to existing and future consumers. I take it the disparagement alleged in this case is that you, that Tradeline produced a bad product. That's right. And the alleged disparagement is based on the allegation that subpoena's testing of those products was procedurally in violation of the agreement, which is what made those statements disparagement. So the disparagement claim is intimately intertwined with the procedural protections that Tradeline alleged were violated as a result of this conspiracy. And then they also go on to say that the conspiracy was to strip Tradeline's of its license with the association. That's the claim here. Now, you take the license away, that claim disappears. Well, even if it doesn't have to disappear for you to prevail, does it? As long as the claim is intertwined in some way, the Arizona case law doesn't say is completely dependent upon. It just is intertwined. That's right, Your Honor. I'm just responding to the question of what happens if the contract went away, which I think is a way of examining the extent to which the contract provisions are intertwined and related to the claim that's being asserted. In this case, as it's pled, if you took the license agreement away, there could be no antitrust claim, because the alleged antitrust violation is the one that was committed. Using words like group boycott and concerted refusal to deal as if they're some sort of talisman is simply an error. Those words have no meaning without focusing on what the conduct was. And I think it's worth noting that in this case, all of the alleged wrongful conduct was committed by subpoena, the signatory to the license agreement. Subpoena is the one that allegedly violated the license. Subpoena is the party that ultimately terminated the license. So the signatory to the agreement is the one that allegedly, according to the complaint, is the principal actor in the conspiracy, and the only, frankly, wrongdoer, other than the conspiracy allegations. So, you know, the overall question here that is asked by all of the courts is, is it fair for the plaintiff to rely on the benefits of the contract when it benefits the plaintiff, but deny the obligations of the contract when it does not, as with this arbitration agreement? I'm getting, I think, close to the end of my time. I just, I'd sum up by saying this. You know, I've read all these cases. I know you have. I looked at it. All of the fact patterns are different. The way that courts have articulated the standards differs from time to time. But in the end, every single case involves an examination of the particular facts of that case, and fundamentally asks the same question, which is, is it fair on the facts that have been alleged? Is it just? Is it equitable? Is it fair to compel this matter to arbitration? This claim doesn't exist at all without the license agreement. They agreed to arbitrate with subpoena, the primary wrongdoer. The only reason, as I think we all know, that subpoena was not named in the district court complaint was as an effort to avoid the obligations of the arbitration agreement. We know that because Tradeline demanded arbitration with Tradeline before filing its federal complaint. We know that because Tradeline added subpoena as a party defendant when this case went to arbitration. And contrary to what esteemed counsel said in response to your question, Judge Hurwitz, that the breach of contract action against subpoena is in no way independent of the antitrust claim. They are one and the same. They are exactly the same claim. And not only are they exactly the same claim based on the same evidence, but at the arbitration, Tradeline conceded that any injury done to it and the quantum of damages was identical for the antitrust claim as for the breach of contract claim against subpoena. Now, the arbitration panel found that they had failed to meet their burden of proving causation and that their damages were too speculative. But there are no independent damages. There is no independent harm. There is no claim independent of the alleged breach of the licensing agreement by subpoena. And that's why applying Arizona law, Judge Kronstadt correctly compelled this case to arbitration. If there are no other questions, thank you, Your Honors. Good morning. Dan Woods on behalf of the J.G. Boswell Company. I agree with what Mr. Duckers has just said. I just want to spend a few moments explaining why Sun Valley Ranch and Arizona law and equitable estoppel apply with equal or even perhaps greater force with respect to the claims against my clients. And that is because Tradeline's entire antitrust claim is premised on violations of the license agreement by Boswell and the other co-conspirators. Tradeline's complaint begins with the allegation that Boswell grows cotton on the world's largest privately owned farm. It goes on to allege that Tradeline's principal, Mr. Palliam, presented Boswell's head of marketing, Mr. Elder, with a business plan. And that business plan called for Tradeline to vertically integrate and eliminate middlemen from the sales of subpoena cotton. Tradeline's complaint then alleged that Mr. Elder viewed this business plan as disruptive because it would have introduced competition into the subpoena cotton market and would have required Boswell to lower its prices. Tradeline then went on to great lengths to allege that Boswell, Jess Smith, and the Subpoena Association conspired together to prevent Tradeline from executing this disruptive business plan. After alleging that the Subpoena Association had only a small staff of five employees and only 11 members of its board of directors, it alleged that Boswell had two seats on the board of directors and alleged no less than 11 times in the complaint that Mr. Elder was the chair of the board of directors. And I've read the complaint. It strikes me that this is sort of a separate argument, isn't it? Aren't they saying, as against your client, its motivation was to make sure that the market wasn't disrupted? It's one thing to talk about, you know, subpoena's motivation was to not deal with these folks anymore. But isn't the allegation against your client that it had anti-competitive reasons for wanting them not to go out and open an independent operation, if you will, and therefore that's why it acted as it did? Yes, and that's why... So how is that intertwined with the contract? Because what the complaint alleges is that Boswell controlled the Subpoena Association. It specifically alleges in paragraph 67 that Subpoena acted under Boswell's direction and control. Trade Line's opening brief at page 33 even states that Mr. Elder commandeered the Subpoena board to act on Boswell's behalf. And then it goes on to allege repeatedly that Boswell conspired with the other co-defendants to deprive Trade Line of its license agreement in order to prevent Trade Line from fulfilling its disruptive business plan and to avoid price competition in the market for Subpoena cotton. And you've already become aware of the specific allegations that under Boswell's control, Subpoena surreptitiously tested Trade Line's products in violation of the license agreement, interfered with Trade Line's potential contract with a merchant in the subject of a couple of questions. So I want to explain that the disparagement involves disparaging the quality of Trade Line's product and specifically that it was not in compliance with the license agreement. And the disparagement was to potential customers whose business would have allowed Trade Line to implement its vertical integration of the Subpoena cotton market to be successful. And then, of course, it alleged that Boswell's conduct caused Trade Line to lose customers in business and had the intended effect of putting Trade Line in such dire financial straits that it couldn't pay its creditors, including Jess Smith, and alleged that the co-conspirators used that as a justification to strip Trade Line of its license. And it is alleged that under Boswell's direction and control, Subpoena revoked Trade Line's license in violation of Trade Line's procedural rights in the license agreement. These allegations are found all throughout the complaint. And then they are tied together in paragraphs 172, which Mr. Duckers has referenced, but which is not found in Trade Line's briefs, even though we raised it in our brief and it wasn't addressed in the oral argument from counsel for Trade Line this morning. But those paragraphs, 172 to 175, alleged that Boswell's conduct in furtherance of this conspiracy restrained trade and competition in interstate and foreign commerce in violation of Section 1 of the Sherman Act. That's what this case is about. There's nothing separate from the license agreement, as has been argued now. And so for all these reasons, Trade Line's complaint against Boswell was and is inextricably intertwined with Subpoena's license agreement with Trade Line. And the district court was correct. Both times it ruled that way, and this court should affirm it. Thank you. Thank you. I'll give you one minute. Thank you. I'd just like to briefly make two points. First, what is the test and what does intertwined mean? And I think it's important to note that in Sun Valley Ranch, and really in all these cases, it talks about whether, quote, the claims were intimately founded in and intertwined with. It's not whether the facts are intertwined or generally intertwined. It's intimately founded in and intertwined with. And that gets to the second point, where the only real question here in terms of whether or not they're intertwined is whether or not we would need a breach in order to prove our antitrust claim. They do not cite a single antitrust case ever holding that a group boycott requires a breach. Doesn't your – doesn't your – they may not have to prove a breach, but doesn't your claim rely on the existence of the contract? Those are the damages you allege, the harm you allege that they – that they engaged in was getting together to cause the termination of your contract. I'm not sure that Iridia-Arizona cases is saying you must prevail under the contract. Isn't the contract tied up in your claims? The contract is certainly part of the story. I mean, it would be hard to tell the story of what happened without referring to the agreement. We recognize that. But that is not the basis for the claim itself or for the injury. And the point is that even if the contract did not exist, so we're trying to enter this market, or even if they had just not renewed the contract. But those are not the facts of this case. The facts of this case are that your gripe with them, in effect, arose out of the termination of your contract. If nobody had ever terminated your contract, you wouldn't have this antitrust claim, would you? True, but the difference between termination and breach. So even if they terminated it in, you know, they argued that there was no breach. Even if that were true, that was terminated in a completely legitimate under-the-contract fashion. If it was done through a conspiracy with the intent to harm competition, which is what we allege, then that is a violation of the antitrust laws that is not inextricably intertwined with the breach. Thank you. Thank you. Mr. Cooper, Mr. Duckers, Mr. Woods, thank you all for your oral argument presentations here today. The case of Tradeline Enterprises v. Jess Smith & Sons Cotton & J.G. Boswell Company is now submitted.
judges: Murguia, Hurwitz, Gaitan